# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HILDA L. SOLIS,                                    )
Secretary of Labor                                 )
  United States Department of Labor,              )
               Plaintiff,                  )
                                  )
                                  ) Civil No. 2:08-CV-1957-LDD
v.                                                 )
                                  )
LOCAL 234,                                         )
TRANSPORTATION WORKERS UNION,                      )
               Defendant.                   )

## DECLARATION OF
## PATRICIA FOX

I, Patricia Fox, am Chief, Division of Enforcement, Office of Labor-Management Standards (OLMS), United States Department of Labor (Department). The Department supervised an election of officers of Defendant Local 234, Transportation Workers Union (Local 234), which was completed on September 24, 2010, pursuant to a July 19, 2010 Consent Decree executed by the parties and so ordered by this court.

All candidates and election committee members involved in Local 234's 2007 election were mailed an invitation, dated July 20, 2010, to attend a pre-election conference on July 30, 2010. The conference provided attendees the opportunity to participate in formulating the election rules by presenting materials or comments.

At the conference, Dona Thompson, an OLMS investigator designated as the election supervisor (Election Supervisor), established the election rules, including nomination and election procedures, protest procedures, and time frames for Defendant Local 234's supervised election The Election Supervisor advised the attendees that the

Department was responsible for assuring the conduct of a fair election under the Labor Management Reporting and Disclosure Act of 1959 (Act), and, insofar as lawful and practicable, in accordance with provisions of Local 234's Constitution (Local Constitution) and Transport Workers of America Constitution and Bylaws (International Constitution).   Moreover, the Election Supervisor advised attendees that the Election Rules were subject to modification.  The Election Supervisor mailed a copy of the rules established at the pre-election conference to all invitees on August 4, 2010.  Candidates received another copy of the Election Rules upon collection of their nominating petitions.

The Election Supervisor had the authority and responsibility for implementing all aspects of the supervised election.  The election committee, which was appointed on July 30, 2010, by the Local 234 President, immediately after the pre-election conference, conducted the election.  Local 234 hired the American Arbitration Association to conduct its tally on the day of the election, verify voter eligibility, and monitor polling sites under the supervision of the Department.

The supervised election was conducted for the offices of President, Executive Vice President, Recording Secretary, Financial-Secretary Treasurer, Vice Presidents (3), Executive Board Members Transportation Division (4), and Executive Board Members Maintenance Division (3).   There were two slates in the election, the incumbent slate and the opposition slate.  The incumbent slate was headed by Willie Brown and the opposition slate was headed by John Johnson.  There was one independent candidate running for the office of Vice President.  The opposition slate defeated the incumbent slate for every office, with the lowest margin of victory of 159 votes for Recording Secretary. The list of those candidates who won the election is attached.

The protest procedure delineated in the Election Rules required that "all protests concerning the conduct of election must be in writing and addressed to the Election Supervisor. . . ." The Department received a written pre-election protest from Melvin Harris, a candidate for vice-president who was disqualified because his nominating petition was not supported by a sufficient number of valid signatures, and a post-election protest by Willie Brown and Brian Pollitt, defeated candidates for President and Vice President, respectively. The substance of the allegations in the protests is summarized below, followed by the Department's resolution of each allegation.

Melvin Harris' pre-election protest received August 31, 2010

Allegation: The Department incorrectly determined that Harris was ineligible to run for Vice President because he fell short by three signatures in meeting the requisite 400 signatures when the election committee and the Election Supervisor invalidated three of the 400 signatures. Moreover, Harris claimed that the number of signatures should not have been the focus for determining his eligibility. Rather, the Department should have focused on verifying that no forged signatures were on any petition.

Response: The nominations procedures for this supervised election were set forth in the Election Rules. Rule 8 of the Election Rules provides, in relevant part:

> In order to be nominated for president, executive vice president, vice president, recording secretary, financial secretary treasurer, a candidate must obtain four hundred (400) signatures of members of the union on his or her petition . . . . All petitions must be signed with signatures and employee account numbers. The Election Committee in conjunction with the Department of Labor representatives will review union and employer records to verify the union status of members who signed petitions.

The investigation disclosed the Election Supervisor compared all signatures and employee account numbers with the Local 234 membership list, which was compiled

3

from lists provided by employers. The Election Committee members read aloud the account number corresponding to a member's signature while an OLMS Investigator matched the account number to the membership list on an Excel spreadsheet. To ensure that members signed only one petition, an indicator was placed on the Excel spreadsheet next to a nominator's name. During this process, the Election Supervisor and the Election Committee disqualified three signatures from the 400 signatures on Harris' petition. One of those three signatures appeared twice on the same petition. Harris conceded these two signatures appeared to be signed by the same person. In addition, two other signatures were illegible. In an attempt to decipher the names, the Election Supervisor tried various combinations of the employee account numbers in an endeavor to identify the signatories but was unsuccessful in producing an eligible member's name. The Election Supervisor provided Harris the opportunity to identify the signatures, but he was unable to do so. In determining the number of valid signatures on a petition, the Department focused not only on the number of requisite signatures to qualify as a candidate for office, but also on the validity of each signature. There was no violation.

<u>Willie Brown and Brian Pollitt's October 4, 2010 post-election protest</u>

Allegation: The Department denied the incumbent slate the right to make automated campaign calls (robocalls) to members using the union's list of members phone numbers, but allowed the Johnson slate to make a membership mailing during the last week of campaigning.

Response: Section 401(c) of the Act mandates that unions refrain from discrimination in favor of or against any candidate with respect to the use of lists of members. 29 U.S.C § 481(c). To avoid charges of disparity of treatment among

4

candidates, the Department's regulations suggest that unions inform candidates in advance of the conditions under which campaign distributions will be made and promptly advise them of any change of those conditions. 29 C.F.R. § 452.67. Although the Election Rules provided for the distribution of campaign literature, no election rule provision addressed the dissemination of campaign messages using the union's list of member phone numbers.

The investigation disclosed that at the July 30, 2010 pre-election conference, all invitees, and other members of the incumbent slate, were informed of the proposed rules for campaign mailings. All invitees, including Pollitt and Brown, both of whom did not attend the conference, were mailed a copy of the Election Rules established at the conference. No participant, including the members of the incumbent slate, raised the possibility of using the union's phone list for robocalls at the conference. At the candidates' meeting held on September 2, 2010, the use of robocalls as a campaign tool was briefly mentioned by a member of the Johnson slate, but Pollott advised that such a method had never been used for a local election. In addition, the Election Supervisor also determined that although Mr. Brown had discussed using robocalls with Local 234's attorney on Sunday, September 19th, he waited three days before he made his last minute request.

The incumbent slate notified the Election Supervisor that it wanted to use robocalls as a campaigning tactic at 2:00 p.m. on Wednesday, September 22, 2010, less than two full days before the September 24th supervised election. At that point, the Election Supervisor determined that there was insufficient time to notify other candidates that the union's phone list would be made available for this purpose and for the other

5

candidates to draft, record, and transmit comparable campaign messages. Therefore, to avoid a disparity in the use of the list of member phone numbers between the incumbent candidates and other candidates, the Election Supervisor ruled that robocalls as a campaign tactic would not be permitted. This ruling was consistent with the statutory principle to refrain from discrimination in favor of or against any candidate with respect to the use of union lists. Further, the fact that the Johnson slate was permitted to make a campaign mailing during the last week of the campaign does not undermine this conclusion, because that method of campaigning was explicitly provided for in the election rules and was timely available to all candidates, including the incumbent slate. There was no violation.

Allegation: SEPTA, the employer, treated incumbent supporters less favorably than it treated Johnson supporters. Specifically, the employer violated its contractual quota system at Southern Depot by granting leave to Johnson supporters but did not grant such leave to incumbent supporters.

Response: Section 401(g) of the Act requires that no employer resources may be used to promote the candidacy of any person in a union election. 29 U.S.C. § 401(g). As such, the discriminatory application of contract benefits to favor particular candidates is not permitted .

The Department's investigation determined that the Southern Depot has in the past had an unwritten practice of granting leave to no more than ten employees per day. However, the current director of Southern Depot, who has held that position for five years, has not denied leave to any employee who has requested leave. The investigation further disclosed that none of the incumbents' supporters at Southern Depot were denied

leave for September 24th, 2010, from the employer and the employer did not treat supporters of particular candidates disparately. There was no violation.

Allegation: The Election Rules required members to be in continuous good standing in order to run for office, but those rules were later waived after nominating petitions were submitted. The Department did not reopen nominations to all members after waiving the rule, thereby denying the incumbent slate of three members that could have qualified to be placed on its ticket.

Response: Section 402(c) of the LMRDA provides, in relevant part, that a supervised election is to be conducted in conformity with the constitution and bylaws of the labor organization, insofar as lawful and practicable. The Local 234 Constitution requires candidates to be members in continuous good standing for twelve months immediately preceding nominations in order to qualify for office. Article VI, Section 1 of the Local 234 Constitution.

During the supervision of the election, after nominations had been made, the Election Supervisor determined that it was not practicable in this case to apply the twelve month good standing provision to the nominees. At the time that the election rules were formulated, Local 234 assured the Election Supervisor that it had all the necessary records to accurately determine each nominee's eligibility, applying the 12-month good standing rule. After the submission of the nominating petitions, the local informed the Election Supervisor that it did not, in fact, have access to this information and that it had not enforced this provision of the Constitution in past elections. The Election Supervisor attempted to obtain this information. While the information was available for three of the four employers of local members, the records obtained from SEPTA, the largest

7

employer of local members, were inadequate to show members' good standing. Consequently, the Election Supervisor waived that constitutional provision for this election. Instead, the Election Supervisor determined that those nominees who could establish 12 months of good standing or who had been on dues check-off for 12 months had demonstrated a commitment to remain in good standing. Over 95 percent of the membership is on dues check-off. The investigation revealed that incumbent President Brown and the attorney for the union agreed that the waiver was the best method for determining eligibility not only for the reason stated above, but also because Local 234 never enforced that provision in any previous election.

With respect to the three members Brown identified as potential incumbent slate members who may have been discouraged from running because of the good standing rule, the investigation disclosed that two of those members, Avignon Dent and Irvin Turner, chose not to join the incumbent slate after being requested to do so, without regard to the good standing rule. The third person Brown identified, Angelina Banks, told the Department she was never asked to join the incumbent slate. There was no violation.

Allegation: A van belonging to an Assistant Superintendent for SEPTA was parked in a conspicuous parking space designated for managers and displayed Johnson campaign material on the van. After that van was removed, the same manager permitted another van belonging to a Johnson supporter to be parked in the same manager-designated parking place, and that van similarly displayed Johnson campaign material. Parking in a manager-designated parking space is normally a disciplinary offence.

8

Response: Section 401(g) of the Act provides, among other things, that no moneys of an employer shall be contributed or applied to promote the candidacy of any person. 29 U.S.C. § 481(g). The investigation disclosed that a vehicle displaying Johnson campaign material was parked in a SEPTA lot. However, SEPTA, permits any employee to park in the spaces at issue. The investigation further disclosed that the vehicle at issue had been loaned by an assistant manager to another employee, who was a member of the union. The van was not the property of the employer. Consequently, the parking of the vehicle in the employer's lot was not an expenditure of employer moneys. There was no violation.

Allegation: An OLMS poll watcher fell asleep while working at the Elmwood Depot polls and did not see or remove from the polling area a Johnson supporter who was wearing a Johnson campaign shirt.

Response: Section 401(c) of the Act provides, in relevant part, that adequate safeguards to ensure a fair election shall be provided. 29 USC § 481(c). The investigation disclosed that two OLMS investigators were posted at the Elmwood Depot polls. One of those investigators took a ten minute break and put her head down on the desk to rest. At all times, including during that investigator's break, the polls were observed by the other OLMS investigator, an observer for the incumbent slate, and AAA staff members. The incumbent's observer stated that no one voted during the ten minutes that the OLMS investigator was on break and that the Johnson supporter complied with her demand to turn his shirt inside out so that the campaign message was not showing. Adequate safeguards were in place to protect the election process. There was no violation.

9

Allegation: In violation of the Election Rules, the Department permitted members to vote at locations other than their own.

Response: The location at which members were permitted to vote was provided in Rule 14 of the Election Rules. Local 234 has various categories of members and the location at which each category of members was to vote was delineated by the rule. However, at a September 22, 2010 meeting held by AAA's National Vice President for its staff, as well as election committee members and interested members, it was determined that if a member appeared at a location not his or her own, he or she could vote at that location as long as certain procedures were followed. Those procedures included immediately notifying an OLMS investigator, and then contacting the location at which that member was designated to vote to verify that member's eligibility. These procedures were approved by Local 234's attorney. These safeguards were established to ensure that no member voted more than once. The investigation disclosed that no member voted more than once nor were any members denied the opportunity to vote. There was no violation.

Allegation: On election day, an OLMS investigator accepted a ride with a member of the Johnson slate, giving the appearance that the Department endorsed the Johnson slate.

Response: The investigation disclosed that the OLMS investigator in question accepted a ride back to the polling place from a member of the Johnson slate after delivering ballots to the AAA. There is no indication that this action gave the appearance that the Department favored one candidate over another or violated any law or Departmental rule. There was no violation.

10

Allegation:   SEPTA prevented incumbent slate supporters from displaying campaign buttons on their clothing, but permitted supporters of the Johnson slate to display Johnson campaign buttons on their clothing.

Response: While Section 401(g) of the Act prohibits employer resources from being used to promote the candidacy of a particular person, an employer may impose restrictions on campaigning or prohibit campaigning altogether on its premises, as long as the rules are applied to all employees uniformly.

The investigation disclosed that some SEPTA shops prohibited campaigning, including the display of buttons on clothing, while other SEPTA shops permitted such displays. In all instances, the rule within a particular shop was equally enforced so that neither slate was disadvantaged. There was no violation.

Allegation: Johnson used the TWU logo on his website in violation of the Election Rules.

Response: The Election Rules contain a specific prohibition against the use of the union logo. Rule 11 provides, in relevant part, that "[i]n accordance with Article X, Section 1 of local 234's bylaws, and agreed at the conference, no campaign literature will be produced or distributed on union letterhead or bearing the union logo."

The investigation disclosed that Johnson displayed the TWU logo on his campaign web page. The logo was in the background of a photograph of him, displayed at the top of the page containing his campaign message. Johnson was informed by the Election Supervisor that he should remove the photograph with the union logo from his website page on August 5, 2010. The photograph was removed on August 13, 2010.

11

Even though the use of the union logo violated the Election Rule, there is no indication that this may have affected the outcome of the election, as required by 29 U.S.C. § 402(c)(2). Any member who saw Johnson's webpage would have been unlikely to conclude that the picture constituted an endorsement of Johnson's candidacy by the union. The photograph at issue showed Johnson posing in front of the logo, without any context implying an endorsement by the union. The website is clearly campaign material, with no risk that it would be confused with official union material. Further, Johnson was a known opposition candidate whose slate was identified on the website as the "New Directions Team." In this context, the presence of the union logo would not be considered an endorsement by the union or a factor that may have affected the election for another reason.

Allegation: Johnson used the TWU logo on posters hung at the Red Arrow facility on election day, in violation of the Election Rules.

Response: As noted above, the Election Rules contain a specific prohibition against the use of the union logo.

Two posters used by the Johnson campaign contained the TWU logo, in violate of this rule. The investigation disclosed that one or both posters were displayed at the following job sites on election day: Comly, Courtland, Midvale, Southern, and Woodland. Department staff were present at each of these job sites and were instructed to obscure the logo by either placing non-transparent tape across the logo or heavily marking the logo with dark ink to render it invisible. Although the display of these posters bearing the TWU logo violated the Election Rules, the logo was visible for a very

12

brief period of time and there is no evidence that this violation may have affected the outcome of the supervised election.

The Department has concluded from its investigation that Local 234's September 24, 2010 election of officers, conducted under the Department's supervision, complied with Title IV of the Act and was conducted, insofar as lawful and practicable, in accordance with Local 234's Constitution, the International Constitution and the Act. Therefore, no reason exists to overturn the results of this supervised election.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24th day of January , 2011, in the City of Washington, District of Columbia.

Patricia Fox

Patricia Fox, Chief
Division of Enforcement,
Office of Labor-Management Standards,
United States Department of Labor

13