IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HILDA L. SOLIS, Secretary of Labor, | : | CIVIL ACTION |
| United States Department of Labor, | : | |
| | : | |
| v. | : | |
| | : | |
| LOCAL 234, TRANSPORT | : | |
| WORKERS UNION. | : | NO.  2:08-CV-1957-LDD |

<u>MEMORANDUM</u>

Legrome D. Davis, J.                                                    August 15, 2011

I.      BACKGROUND

This matter is before the Court on the Secretary of Labor's motion requesting that we declare the victorious candidates from the Local 234, Transport Workers Union ("Local 234") election held on September 24, 2010 as the duly-elected officers and at-large executive board members of Local 234.  A previous election for the same positions was held on September 28, 2007.  On April 25, 2008, the United States Secretary of Labor filed a Complaint pursuant to Title IV of the Labor-Management Reporting and Disclosures Act of 1959, as amended, 29 U.S.C. §§ 401, et seq. (LMRDA or "Act"), seeking an order to void the September 28, 2007 election and to hold a new election under her supervision.  On July 16, 2010, the Secretary and Local 234 agreed to have the Secretary supervise its next regularly-scheduled election pursuant to Section 402(c) of the LMRDA, 29 U.S.C. § 482(c).  On July 19, 2010, this Court entered an Order approving the parties' agreement by Consent Decree.  Events of the supervised election held in accordance with that Consent Decree give rise to the current dispute.

The candidates in the supervised election were aligned on two slates.  One slate was headed by incumbent officers Willie Brown, for President, and Brian Pollitt, for Executive Vice

President.  This slate was named the "Unity Team."  The other slate—the insurgent slate—was headed by John Johnson, and was named the "New Direction Team."  The election was completed on September 24, 2010 with members of the New Direction team winning each open position.  In the race for President, Johnson beat incumbent Brown by a margin of 1915 votes to 1672.  Andre Jones beat incumbent Pollitt for Executive Vice President 1870 votes to 1659.  Each of the other 12 positions was claimed by members of the New Direction team in similar margins of victory.

After the conclusion of the election, the heads of the Unity Team, Brown and Pollitt, filed a protest with the Secretary, arguing numerous violations of the LMRDA, and seeking a third election.  On January 28, 2011, the Secretary filed a motion requesting that we enter a final decree pursuant to Section 402(c) that the victorious candidates from the supervised election completed on September 24, 2010 are the duly-elected officers of Local 234.  In support of her motion, the Secretary has submitted the certification of Patricia Fox, the Chief of the Division of Enforcement of the United States Department of Labor's ("Department") Office of Labor Management Standards, and a supporting declaration by Ms. Fox ("Fox Declaration"), which sets forth the Department's responses to Brown and Pollitt's initial protest to the supervised election.  The Fox Declaration asserts that the Department investigated the allegations contained in the protest, concluded that the election complied with Title IV of the Act, 28 U.S.C. § 481 et seq., and that it was conducted, insofar as lawful and practicable, in accordance with Local 234's Constitution, the Transport Workers Association of America Constitution and Bylaws, and the Act.  Therefore, according to the motion, no reason exists to overturn the results of the supervised election, and, as such, 29 U.S.C § 482(c)(2) requires that, upon the certification, we

shall enter an Order declaring the victorious officers as duly elected.

Willie Brown and Brian Pollitt (hereinafter "Intervenors" or "Brown and Pollitt") follow-up on their initial protest by intervening and filing a cross-motion opposing the entry of final judgment in this matter.  Brown and Pollitt raise four main arguments in support of their motion.  First, they assert that the Secretary found that the New Direction team violated the Election Rules by the unlawful use of the International Union logo on their campaign materials.  This, Brown and Pollit argue, constitutes a Title IV violation under the Act, which in itself suffices to establish that the violation "may have affected" the outcome of the election, hence, requiring a rerun.  Brown and Pollitt also argue here that the Secretary ignored convincing evidence that the use of the International logo "may have affected" the outcome of the election.  Second, Brown and Pollitt allege that the Secretary misapplied a fundamental eligibility requirement in union elections—one set forth in the Election Rules and the Transport Workers Union (TWU) Constitution—that a candidate must be a member in continuous good standing for the twelve month period preceding his or her nomination.  Brown and Pollitt argue that the Secretary's waiver of this rule without reopening nominations to the entire union membership deprived the Unity Team of the support of candidates who could have run with their slate had the waiver been properly applied.  Third, Brown and Pollitt allege that the Secretary denied the Unity Team the right to access Local 234's telephone list to communicate with the electorate via "robocalls" at a critical stage of the campaign, in violation of Section 401(c), 29 U.S.C. § 481(c),  and Title I, 29 U.S.C. §§ 411 et seq., of the Act.  Finally, Brown and Pollitt allege that the New Direction team violated Section 401(g), 29 U.S.C. § 481(g), of the Act when they received employer financial assistance that enabled them to place more campaign workers in the field on election day at one

of the biggest polling locations.

The Secretary filed a motion for summary judgment, responding to the issues raised in Brown and Pollitt's motion, and providing argument to supplement the findings set out in her declaration.  Local 234 also filed a brief in response to Brown and Pollitt's motion.  The motions are now ripe for disposition.

II.      STANDARD OF LAW

In challenging the Secretary's decision to certify the election results, Brown and Pollitt face the heavy burden of demonstrating "whether the Secretary's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law—in this case the legal requirements of § 402 of the [LMRDA]."  Hodgson v. Carpenters Resilient Flooring, Local Union No. 2212, 457 F.2d 1364, 1370 (3d Cir. 1972).  As the Supreme Court has prescribed, a decision is deemed arbitrary or capricious when the decision maker failed "to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n of U.S., Inc., v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Although the parties agree that the Secretary's determination is reviewed by the district court under this familiar "arbitrary and capricious" standard of the Administrative Procedures Act (APA) (see Intervenors' Mot. at 4), the parties disagree as to the proper scope of that review. Brown and Pollitt argue that they have a right to challenge the both the legal *and* factual bases of the Secretary's decision to certify the election supervised by the Secretary.  If there are disputed material facts, Brown and Pollitt state, we must hold a hearing to create an evidentiary record for

4

our consideration of the Secretary's decision.  The Secretary argues that we should confine the scope of our review to the Secretary's stated reasons for her decision; Brown and Pollitt are not entitled to "the full trappings of an adversary trial of their challenge to the factual basis for" that decision.  (Pl.'s Mot. Summ. J., Doc. No 44 at 4 (quoting Dunlop v. Bachowski, 421 U.S. 560, 577 (1975)).)

The parties' argument reflects an apparent tension in the appellate case law on the matter. In 1972, in Carpenter's Resilient Flooring, the Third Circuit suggested that, before passing on the Secretary's certification in a supervised election, an evidentiary hearing is required and the summary judgment procedures of Federal Rule of Civil Procedure 56 apply.  457 F.2d at1369-70. Three years later, however, in 1975, the Supreme Court in Bachowski held that complaining parties may not challenge the "factual basis" for the Secretary's conclusion.  421 U.S. at 577. The Court in Bachowski made clear that, in enacting the LMRDA, Congress "decided to utilize the special knowledge and discretion of the Secretary," id. at 568 (internal citation and quotation marks omitted), and "deliberately [gave] exclusive enforcement authority to the Secretary," id. at 569 (internal citation and quotation marks omitted).  Ultimately, the Supreme Court in Bachowski held that the district court's review of the Secretary's decision

> may not extend to cognizance or trial of the complaining member's challenges to the factual bases for the Secretary's conclusion either than no violations occurred or that they did not affect the outcome of the election.  The full trappings of adversary trial-type hearings would be defiant of congressional objectives not to permit individuals to block or delay resolution of post-election disputes . . . . If the Court concludes there is a rational and defensible basis stated in the reasons statement for the Secretary's determination, then that should be the end of the matter.

Id. at 573 (internal citation and quotation marks omitted).

5

Although the <u>Bachowski</u> decision involved the Secretary's decision to certify the results in an unsupervised election, the Court of Appeals for the D.C. Circuit pointed to <u>Bachowksi's</u> broad rationale and found that it applied in the case of both supervised and unsupervised elections—in neither case may the challenger have the opportunity for an evidentiary hearing or additional discovery.  <u>Usery v. Local 639, Int'l Bhd. of Teamsters</u>, 543 F.2d 369 (D.C. Cir. 1976) ("<u>Local 639</u>").  "<u>Bachowski</u>," the D.C. Circuit stated, "delineates a scope of review much narrower than applies . . . in most other administrative areas and constrains the very mode of review."  <u>Id.</u> at 378 (internal citation and quotation marks omitted).  <u>Bachowski's</u> "considerations of special knowledge and discretion are applicable particularly where the election is held under the Secretary's ongoing supervision and control."  <u>Id.</u> (internal quotation marks omitted).   The court went on to state:

> Indeed, because of the Secretary's oversight and familiarity, the rerun, if certified, enjoys a presumption of fairness and regularity.  Moreover, the statutory concern with expeditious resolution of post-election disputes is no less present at this stage, indicating the need for a foreshortened review process.

<u>Id.</u> at 378-379 (internal quotation marks omitted).   Thus,

> where the Secretary's statement on its face indicates a rationally based decision the court's task is at an end, unless the challenger makes a specific factual proffer of irregularity, in which event the burden of persuasion shifts to the Secretary to provide further supplementation (the ultimate burden of proof resting with the challenger).

<u>Id.</u> at 379 (internal quotation marks omitted).

In <u>Donovan v. Westside Local 174, UAW</u>, 783 F.2d 616 (6th Cir. 1986), however, the Sixth Circuit held that when allegations of misconduct are directed at the Secretary rather than the union, as is the case with objections to a supervised election, the <u>Bachowski</u> standard does

not apply.   "Such a standard would . . .  permit [the Secretary] too much discretion and would

result in complete reliance on his 'good faith.'"  Id. at 625 n.19 (citing Carpenters Resilient

Flooring, 457 F.2d at 1370).  Therefore, the court stated,

> the district court's scope of review for granting the Secretary's motion to certify is
> not limited to the Secretary's statement of reasons. Based on the court's obligation
> to ensure democratic elections, we hold that it is within the court's discretion to
> determine the appropriate scope of review in certification proceedings.

Id. at 626.  On remand from the Sixth Circuit, the district court in Westside Local 174 held a

hearing, applied the arbitrary and capricious standard under the APA, citing the D.C. Circuit's

opinion in Local 639, 543 F.2d 369, and granted the Secretary's motion to certify the results.

Brock v. Westside Local 174, 643 F. Supp. 602, 603-605 (E.D. Mich. 1986).

        Although it seems clear to us, as it did to the D.C. Circuit in Local 639, that the rationale

of the Supreme's Court's pronouncements in Bachowski did not limit its findings to the

unsupervised election context, we need not draw the parties' argument to its exhaustive end.

Even if we were to expand the scope of the inquiry to include the "outside" arguments and facts

Brown and Pollitt now proffer, they do not affect the bottom-line conclusion in this case: the

Secretary's determination was not arbitrary, capricious, an abuse of discretion, or otherwise

contrary to law.  In her brief, the Secretary argues that, just because there are facts in dispute, that

does not mean they are material to the Court's analysis—we may consider the evidence put forth

in the parties' briefs and determine that this evidence still requires judgment in the Secretary's

favor.  The parties basic disagreement, therefore, is only realized if there are facts in dispute that

are *material* to the analysis.[1]   In the present case, however, as we explain fully below, none of

_____

        [1]The Secretary's argument here conjures the summary judgment standard of Federal Rule
of Civil Procedure 56(a), which the pre-Bachowski Third Circuit panel applied in Carpenters

the "outside" arguments Brown and Pollitt rely on create genuine issues that might change the

result in this case.  Though we open the door to Brown and Pollitt's proffers, they are either not

material to the analysis, or the Secretary has provided sufficient supplementation to demonstrate

that her decision was not improper.  See Local 639, 543 F.2d at 379 ("[When] the challenger

makes a specific factual proffer of irregularity . . .  the burden of persuasion shifts to the

Secretary to provide further supplementation (the ultimate burden of proof resting with the

challenger).")  As our analysis below makes clear, our conclusion remains constant under either

the D.C. Circuit or the Sixth Circuit's understanding of Bachowski and the appropriate scope of

review.

III.    ANALYSIS

    A.    Use of the TWU Logo

Brown and Pollitt's first argument deals with Johnson's use of the TWU logo on his

campaign materials and the Secretary's determination that the use of the logo did not violate the

LMRDA.  Brown and Pollitt's Statement of Facts (Doc. No. 43-2) references Exhibits O, P-1,

and P-2 for representations of the alleged illicit use of the union logo in Johnson's campaign

---

Resilient Flooring, 457 F.2d at 1369-70.  Under Rule 56, judgment must be granted for a movant "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" for purposes of summary judgment if a dispute over that fact "might affect the outcome of the suit under the governing law."  Id. at 248.  A dispute as to a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Id.  The dispute is not genuine if it simply involves "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

materials.  Those exhibits show various campaign materials—a poster, a pamphlet, and a
webpage screen capture—featuring the same photograph of Johnson standing in front of a
window that has the TWU logo printed on it.  Brown and Pollitt argue that the Secretary ignored
the law, which states that the use of the logo constituted a violation of Section 401(g)'s
prohibition against the use of organization or employer "moneys" in a union election campaign.
This 401(g) violation, Brown and Pollitt argue, satisfies their burden to establish that outcome of
the election may have been affected, such that the Secretary is required to present tangible
evidence rebutting the presumption.

At the outset, we find that Brown and Pollitt misstate the law.  First, the rule establishing
that a Section 401 violation necessarily makes out a prima facie case of probable impact on the
outcome of an election "is the rule for violations . . . which are committed in the course of an
*unsupervised* election."  Local Union No. 639, 543 F.2d at 379 (emphasis added).  In a
supervised election, the Secretary's presence "establishes a presumption of fairness and regularity
that is not upset by an appellant's showing."  Id. at 379-380 (internal citation and quotation marks
omitted).  Second, "[t]he use of a union logo, by itself, on campaign literature need not inevitably
violate section 401(g)."  McLaughlin v. Am. Fed'n of Musicians of U.S. and Can., AFL-CIO,
700 F. Supp. 726, 736 (S.D.N.Y. 1988) (citing Donovan v. Teamsters, Local 480, No. 3-84-0568,
1885 WL 25637 at *4 (M.D. Tenn. Jul. 11, 1985).   As the Supreme Court has stated, the
statutory scheme set out in the Act "was reached in light of the abuses surfaced by the extensive
congressional inquiry showing how incumbents' use of their inherent advantage over potential
rank and file challengers established and perpetuated dynastic control of some unions."  Wirtz v.
Local 153, Glass Bottle Blowers Ass'n, 389 U.S. 463, 474 (1968) (citing S. Rep. No.1417, 85th

Cong., 2d Sess.).  In this vein, the "no moneys" prohibition reflects "Congress's intent that no illicit *support* of a candidate during a union election go unrecognized."  Donovan v, Local Union 70, Int'l Bhd. Of Teamsters, 661 F.2d 1199, 1202 (9th Cir. 1981) (emphasis added).

Accordingly, to constitute a contribution or application of moneys in violation the Act, the use of a logo must at least reflect the appearance of union or employer "support" of a candidate.  See 29 U.S.C. § 481(g) ("No moneys received by any labor organization . . . shall be *contributed or applied to promote* the candidacy of any person in any election.") (emphasis added); see also Shultz v. Local Union 6799, United Steelworkers of Am., AFL-CIO,  426 F.2d 969, 972 (9th Cir. 1970) ("[The Act] provides in terms that 'no moneys' of a union *shall be spent to promote* the candidacy of any person for union office.") (emphasis added).   The two cases Brown and Pollitt highlight, applied this standard in finding that the use of a logo violated the Act.  In American Federation of Musicians, the United States District Court for the Southern District of New York stated, "[a]ttention must . . . be directed to whether the use of the logos promoted the candidacy of [the candidate],"  700 F. Supp. at 736.  The court found that use of union logos on campaign letters written by a local union president endorsing one candidate and criticizing another constituted a use of union moneys to promote the former candidate's campaign, in violation of section 401(g).  In Brennan v. Sindicato Empleados de Equipo Pesado, the United States District Court for the District of Puerto Rico found that a newspaper advertisement that included the union logo and attacked the candidacy of a challenger violated the Act.  370 F. Supp. 872 (D.P.R 1974).  The court stated, "[t]he logos of the union, the credit and goodwill of the union, *together* with the time of the union secretary [spent preparing the advertisement], constitute assets of a labor organization and these assets were contributed or applied *to support* [the incumbent's]

10

candidacy." <u>Id.</u> at 879 (emphasis added).

In the present case, the Secretary's investigation considered the nature and extent of the use of the logo, and found that it did not reflect the appearance of union or employer support of Johnson and that there was no other evidence that the use of the logo may have affected the outcome of the election. The Secretary's conclusions here were not arbitrary or capricious. The Fox Declaration states,

> The logo was in the background of a photograph of [Johnson], displayed at the top of the page containing his campaign message. Johnson was informed by the election supervisor that he should remove the photograph with the union logo from his website page on August 5, 2010. The photograph was removed on August 13, 2010. . . . Any member who saw Johnson's webpage would have been unlikely to conclude that the picture constituted an endorsement of Johnson's candidacy by the union. The photograph at issue showed Johnson posing in front of the logo, without any context implying an endorsement by the union. The website is clearly campaign material, with no risk that it would be confused with official union material. Further, Johnson was a known opposition candidate whose slate was identified on the website as the "New Directions Team." In this context, the presence of the union logo would not be considered and endorsement by the union or a factor that may have affected the election for another reason.

(Decl., Doc. No. 37-3, at 11-12.)

Clearly, there is a factual and legal difference between the president of a union sending out letters with the union logo promoting a candidate, as was the case in <u>American Federation of Musicians</u>, 700 F. Supp. 726, or a union secretary preparing a newspaper advertisement that was paid with union funds and included the union logo in criticizing a challenger to an election, as was the case in <u>Sindicato Empleados</u>, 370 F. Supp. 872, and the present case where a challenger used campaign materials with a photograph of him standing in front of a window revealing the union logo. The former cases give the appearance of union support and endorsement, which logically "may affect the outcome" of the election. In the present case, it is unlikely that any

reasonable voter would interpret the logo as demonstration of union endorsement or support for the candidate.  The Secretary determined that the logo was unlikely to suggest endorsement on the part of the Union.  Without the effect of endorsement or support, the logo was unlikely to have affected the outcome of the election in violation of the Act.  Because we find this reasonable, we uphold the Secretary's decision under arbitrary and capricious review.

Brown and Pollitt also argue that the Secretary ignored "substantial evidence" that the use of the union logo affected the outcome of the election.  Brown and Pollitt capture a selection of poll results showing a total margin of victory at five "infected" polling locations—where posters showing the union logo were hung—which is significantly greater than the overall margin between the two candidates at the 20 total locations.

With regard to use of the logo at the five polling locations, the Fox Declaration states,

The investigation disclosed that . . . posters were displayed at the following job sites on election day: Comly, Courtland. Midvale, Southern, and Woodland. Department staff were present at each of these job sites and were instructed to obscure the logo by either placing non-transparent tape across the logo or heavily marking the logo with dark ink to render it invisible.  Although the display of these posters bearing the TWU logo violated the Election Rules, the logo was visible for a very brief period of time and there is no evidence that this violation may have affected the outcome of the supervised election.

(Decl., Doc. No. 37-3, at 12-13.)

Brown and Pollitt, on the other hand, argue that

the election results completely contradict the Secretary's assertion that there is "no evidence" that the logo violation "may have affected the outcome of the election." To the contrary, the election results provide tangible evidence that the unlawful use of the International Union logo actually affected the outcome of the election. Indeed, given the election results, the DOL's "no evidence" contention merely serves to demonstrate its shoddy, "results oriented investigation" conducted by an agency apparently embarrassed by its inability to conduct an untainted Title IV election, after three years of litigating the issue and entering into a Consent Decree

it did not fulfill.

(Intervenors' Mot. at 12.)

We find, however, that Brown and Pollitt's "evidence" regarding the total margin of victory for Johnson at these locations does nothing to upset the Secretary's findings with regard to the use of the logo at these locations.  The complete election results, which Brown and Pollitt conveniently omit from their motion, demonstrate significant margins of victory for Johnson at numerous other polling locations, which had no claim of infection through the posters.  (See Sec'y's Ex. 18 (demonstrating the following margins of victory for Johnson: Germantown: 23 - 9; Fern Rock: 186 - 90; 69th & Market: 102 - 50; 20th & Johnson: 281 - 84; Walnut & Locust: 60 - 32).)  Further, the election results reveal that, at one of the five locations, Woodland, Brown actually had a 70 to 15 vote margin of victory over Johnson, despite Johnson's brief but allegedly infecting use of the logo on the window in the background of a picture of him appearing on his campaign poster.  The loose correlation that Brown and Pollitt introduce does nothing to demonstrate that the brief display of a photograph of the union logo in the background of some campaign materials caused any voter to cast her or his vote in a certain way.  The incomplete evidence Brown and Pollitt proffer creates nothing more than a slight air of "metaphysical doubt,"  Matsushita,, 475 U.S. at 586, which simply does not go far enough to meet their heavy burden of demonstrating that the Secretary's determination was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.  In sum, given the nature and extent of the use of the logo, and the lack of evidence suggesting the use of the logo likely affected the outcome of the election, we find that the Secretary's determination was not improper.  The Secretary considered the important aspects of the problem, and her reasoning is in line with the facts, the language of

13

the statute, and its purpose.  Accordingly, the Secretary's motion is granted and Intervenors'

motion is denied in this regard.

B.      The Good Standing Rule

Section 402(c) of the Act provides that an election conducted under the Supervision of

the Secretary shall be held "so far as lawful and practicable, in conformity with the constitution

and bylaws of the labor organization."  Article VI, Section 1 of the Local 234 Bylaws provides

that, in order to be a candidate for office, a member must have been in continuous good standing

for 12 months preceding nomination—i.e., the member must have paid union dues or met an

exception to the dues requirement.  During the supervision of the election at issue, after

nominations had been made, the Election Supervisor determined that there was not sufficient

information available to enforce the twelve month good standing provision.  The requirement,

therefore, was waived.

In their initial protest, Brown and Pollitt objected to the Department's waiving of the

continuous good standing requirement without re-opening nominations to the rest of the

membership.  They argued that waiving the requirement without opening nomination to all

members deprived the incumbent slate of three members—Avignon Dent, Irvin Turner, and

Angelina Banks—who could have been placed on its ticket.  The Secretary considered Brown

and Pollitt's argument and found it to be meritless.  The Fox Declaration states,

> With respect to the three members Brown identified as potential incumbent slate
> members who may have been discouraged from running because of the good
> standing rule, the investigation disclosed that two of those members, Avignon
> Dent and Irvin Turner, chose not to join the incumbent slate after being requested
> to do so, without regard to the good standing rule.  The third person identified,
> Angelina Banks, told the Department she was never asked to join the incumbent
> slate.

14

(Decl., Doc. No. 37-3, at 8.)

The Secretary's present motion supplements her initial determination regarding the three members in question and states that "re-opening the nomination process, given the timing, would not have been practicable." (Sec'y's Mot. Summ. J., Doc. No. 44, at 17.)   The Secretary indicates that the requirement  was waived on August 19, 2010.  The election was scheduled for September 24, 2010.  Re-opening nominations would have required notifying the entire union membership of the waived requirement, convening another meeting at which potential candidates were advised of the election rules, allowing potential candidates an opportunity to gather the requisite signatures on the nominating petitions, gathering those signatures, verifying that the signatures are proper, sending letters to the nominees asking them to accept the nominations, and returning those letters.   (Sec'y's Mot. Summ. J., Doc. No. 44, at 17.)  "Given all that had to be done and the little time to do it, it was rational to not re-open the nominations."  (Sec'y's Mot. Summ. J., Doc. No. 44 at 17.)    Furthermore, the Secretary states that, despite the fact that Brown and the other candidates knew the continuous good standing requirement had been waived,  none of the nominees had asked the Secretary to re-open nominations prior to the September 24, 2010 election.  The Secretary points out that the Election Supervisor notified all the candidates by letter, mailed on August 19, 2010, concerning the clarification of the eligibility rules.  However, none of the candidates contacted the Election Supervisor to demand that the nominations be re-opened so that candidates could reform their slates, or for any other purpose.

Brown and Pollitt's motion does nothing to suggest that we should upset the Secretary's determination.  Brown and Pollitt do not respond to the Secretary's determination that re-opening

the nominations would have been impracticable, nor do they argue that they had indeed requested that the nominations be re-opened to the membership.  Instead, they rehash their argument that, had the nominations been re-opened, three members who had been previously ineligible, would have run on their ticket.  We find that Brown and Pollitt's argument, and the evidence they rely on, fails to demonstrate that the Secretary's decision regarding the application of the waiver of the good standing rule was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

   In a declaration attached to Intervenor's motion, Brown states that it was the continuous good standing rule that caused him to exclude certain politically influential Local 234 members from his slate.  (Brown Decl., Doc. No 43-4, Ex. F-1 at ¶ 11.)  He states that he had spoken to Avignon Dent and Irvin Turner about running, but "once I found out they were not members in continuous good standing, I abandoned my effort to recruit them."  (Brown Decl., Doc. No 43-4, Ex. F-1 at ¶ 13.)  It is clear that, prior to the election, Brown received notice that the continuous good standing rule was to be modified.  (Brown Decl., Doc. No 43-4, Ex. F-1 at ¶ 14.)  Despite this notice, he never raised the issue of opening the ballot to the entire pool of potential candidates.  He waited until after the election was over to raise the issue.  Brown now attempts to present evidence that the same individuals he attempted to recruit abandoned their own plans to run for a position on the Unity Team.  (Intervenors' Mot., Doc. No. 43 at 19.)  Brown's argument is inconsistent here.  In his declaration, Brown, the candidate for President of the union, states that *he* was attempting to "recruit" Dent and Turner, and that *he* made the decision to "abandon" his effort once he found out they were not members in good standing.  Brown now attempts to present evidence that the individuals themselves abandoned their own pursuits—had they known

16

of the change, they would have decided to run with him.  If Brown wanted these members as part

of his slate, he should have raised the issue once the continuous good standing rule was changed,

and prior to the election.  He chose to wait until he lost the election to raise an issue which was

ripe before the votes were cast.  To allow Brown to keep that arrow in his quiver to now draw

against Secretary would be a manifest violation of the notions of fair play undergirding the Act.

To this Court, Brown's untimely argument appears to be nothing more than an attempt to

manufacture grounds for a rerun where there are none.  Accordingly, the Secretary's

determination that there was no violation committed by the Election Supervisor's failure to re-

open the nominations was not improper.

      C.      The Robocalls

      Brown and Pollitt challenge the Secretary's determination that it was not a violation of

the Act for the Election Supervisor to deny the Unity Team's request, two days prior to the

election, to access the membership telephone list in order to place automated call to the

members.  We find that the Secretary's determination was not arbitrary and capricious.

      Upon investigation of Brown and Pollitt's initial protest, the Secretary found:

> The incumbent slate notified the Election Supervisor that it wanted to use
> robocalls as a campaign tactic at 2:00 p.m. on Wednesday, September 22, 2010,
> less than two days before the September 24th supervised election.  At that point,
> the Election Supervisor determined that there was insufficient time to notify other
> candidates that the union's phone list would be made available for this purpose
> and for the other candidates to draft, record, and transmit comparable campaign
> messages.  Therefore, to avoid a disparity in the use of the list of member phone
> numbers between the incumbent candidates and other candidates, the Election
> Supervisor ruled that robocalls as a campaign tactic would not be permitted.  This
> ruling was consistent with the statutory principle to refrain from discrimination in
> favor of or against any candidate with respect to the use of union lists.

(Decl., Doc. No. 37-3, at 12-13.)  This reasoning comports with the language of the section of the

17

Act governing access to union lists in elections, and the congressional intent underlying the act.

Section 401(c) of the Act provides, in relevant part, that:

> Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution.

29 U.S.C. § 481(c).  As the language of the statute makes clear, it would be permissible for a union to grant access to its member's phone numbers for the purposes of making robocalls provided that the request was *reasonable* and *not discriminatory*.  The Secretary found that, with only two days to go before the election, there was insufficient time to notify other candidates that the union's phone list would be made available for this purpose, and for the other candidates to draft, record, and transmit comparable campaign messages.  The Secretary considered the important aspects of the problem, and her reasoning is in line with the facts, the language of the statute, and its purpose of "offset[ing] the 'inherent advantage over potential rank and file challengers' possessed by incumbent union leadership."  See Int'l Org. of Master, Mates, & Pilots v. Brown, 498 U.S. 476 (1991)(citing Wirtz v. Glass Bottle Blowers, 389 U.S. 463, 474 (1968)).   Accordingly, we find that the Secretary's determination here was not arbitrary or capricious, and the Intervenors' motion on these grounds is denied.

18

D.        The Quota System at SEPTA's Southern Depot

In their initial protest, Brown and Johnson alleged:

> SEPTA allowed Johnson campaign workers at Southern Depot to get off from
> work on election day in violation of a contractual quota system for the depot,
> while denying supporters of the Willie Brown Unity Team the same opportunity
> to establish a campaign presence at the depot.

(Sec's' Mot., Doc. No 44-2 at Ex. 1 ¶ 2.)  Upon investigating this allegation, the Secretary

determined a violation of the Act had not been committed.  The Secretary conducted an

investigation of the allegation and concluded:

> [T]he Southern Depot has in the past had a written practice of granting leave to no
> more than ten employees per day.  However, the current director of Southern
> Depot, who has held that position for five years, has not denied leave to any
> employee who has requested leave.  The investigation further disclosed that none
> of the incumbent's supporters at Southern Depot were denied leave for September
> 24, 2010, from the employer and the employer did not treat supporters of
> particular candidates disparately.

(Decl., Doc. No. 37-3, at 12-13.)

Brown and Pollitt now renew their argument and couch it as a 401(g) violation, arguing

that, even though their team had three Southern Depot operators among the ten employees who

had placed their name in the day off book, SEPTA expended employer funds in violation of

Section 401(g) of the Act when it permitted employees who occupied positions 11-13 on the list

to take the day off of work to support the Johnson slate.  The Secretary's motion confronts this

argument and states:

> First, none of the intervenors' supporters were denied leave . . . . Next, SEPTA
> management informed the Secretary that the "strictly enforced" quota policy—as
> the intervenors would have it—was neither strictly enforced nor a policy.  The
> work site in question had an unwritten practice of granting leave to no more than
> ten employees per day.  But SEPTA management routinely went above that
> quote—some 56 times in the ten months leading up to the election—as confirmed

19

> by management's records.  Report of Interview John Carson, Exh. 16, pp 2-3.
> Finally, SEPTA management further told the Secretary that, in the several years
> leading up to the election, it has been management's practice to grant leave to
> anyone who asked.  In short, if Brown's supporters had asked for leave, they
> would have gotten it.  SEPTA did nothing to treat one slate more favorably than
> another.

(Sec'y's Mot. Summ. J., Doc. No. 44 at 22.)  Since there was no true cap on the number of

employees that could get leave on a given day, granting employees 11, 12, and 13 leave was no

more or less an expense to the union that granting employees 1 -10 leave.  Brown and Pollitt did

not, and cannot, complain that giving employees 1-10 leave violated the Act because some of

these employees left work to support the Unity Team.  We find, therefore, that Brown and Pollitt

have failed to demonstrate that the Secretary's determination was arbitrary and capricious.  The

Secretary clearly conducted a thorough investigation.  She provided an adequate basis for her

decision through the Fox Declaration as supplemented by her motion.  Brown and Pollitt fail to

demonstrate that the Secretary did not consider an important aspect of the problem, or offered an

explanation for its decision that runs counter to any evidence before the agency.  Accordingly,

the Secretary's motion in this regard is granted, and the Intervenors' motion is denied.

IV.    CONCLUSION

For the foregoing reasons, the Intervenor's cross-motion for summary judgment to

void Local 234's election and to conduct a new election under the Secretary's supervision

(Doc. No. 43) will be denied.  The Secretary's motion for the entry of a final declaration

of election results (Doc. No. 37), and her motion for summary judgment in support of her

declaration and in response to the intervenor's motion (Doc. No.44) will be granted and

the victorious candidates in the election completed on September 24, 2010 will be

declared the duly elected officers of Local 234, Transport Workers Union.  An

appropriate Order follows.